ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Medical Receivables Solutions, Inc. | ) ASBCA No. 64036 |
| | ) |
| Under Contract Nos. W91YTZ-25-P-0002 | ) |
| W91YTZ-23-C-0018 | ) |

APPEARANCE FOR THE APPELLANT:      Ms. Aleshia Hunter
      President

APPEARANCES FOR THE GOVERNMENT:     Dana J. Chase, Esq.
     Army Chief Trial Attorney
     MAJ Danielle C. Naser, JA
     LTC Sean B. Zehtab, JA
     MAJ Joshua A. Reyes, JA
     Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE WILSON ON
THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

Appellant Medical Receivables Solutions, Inc. (MRS or appellant) appeals from a contracting officer's final decision in which the Department of the Army (Army or government) found that MRS had not demonstrated entitlement to the full dollar amount contained in its termination settlement proposal (TSP). The Army has moved for summary judgment, arguing that MRS's appeal is barred by the release of claims contained in a bilateral contract modification the parties executed. The Army also contends that the release constitutes an accord and satisfaction. In response, MRS criticizes the Army's performance under the short period the contract was in effect and its subsequent handling of MRS's TSP, but does not address the Army's arguments concerning the effect of the release. We grant the Army's motion for summary judgment and deny the appeal.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On September 27, 2023, the Army awarded MRS Contract No. W91YTZ-23-C-0018 (contract), effective October 1, 2023, for medical coding services to be performed remotely for Keller Army Community Hospital in West Point, New York

(R4, tab 6 at 1, tab 7 at 1).[1]  This firm fixed price, commercial item contract consisted of a one-year base period commencing October 1, 2023, with four one-year option periods running through September 2028 (R4, tab 6 at 1, 3-12).

2.  The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL PRODUCTS AND COMMERCIAL SERVICES (DEC 2022) (R4, tab 6 at 1, 15; gov't mot., statement of undisputed material facts (SUMF) ¶ 1)).[2]  That clause provides in part:

> The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. . . . Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination.

FAR 52.212-4(*l*).

3.  Section 1.4.7 of the contract's performance work statement (PWS) required the contractor to establish and maintain a quality control plan (QWP) and submit three written copies of that plan within 30 days of contract award (R4, tab 7 at 9). Section 1.4.7.1 described the contract's staffing requirements, and Section 1.4.7.2 required the contractor to provide a weekly fill/vacancy report until staffing reached 100% (SUMF ¶¶ 5-6; R4, tab 7 at 9-10).  Section 1.5.1 required the contractor to begin submitting applicant resumes and other documentation for the required staff within seven working days of award (R4, tab 7 at 10).  The record contains no evidence MRS submitted any of those materials.

4.  The Army's Rule 4 file indicates the parties communicated via email on numerous occasions between October 2, 2023, and October 19, 2023.  In those emails, the parties discussed, among other things, the need to schedule a "kick-off" meeting and requests from MRS's president for workload data she stated she needed to

---

[1] Where the government numbered its Rule 4 documents, it used leading zeroes, which we omit.  We use the PDF page numbers for submissions from either party that were not paginated.

[2] In its opposition to the Army's motion, MRS did not include specific responses correlating to the Army's Statement of Undisputed Material Facts, although it disputes many of them by implication.

establish a staffing baseline.  (*See* SUMF ¶¶ 7-14, 16-26 (discussing the content of emails appearing at R4, tabs 9-15, 17-18, 20-22))

5.  The record indicates that the parties were unable to reach an agreement on these two issues.  Ultimately, MRS's president declined to participate in the kick-off meeting because she was frustrated by the Army's alleged failure to provide her with daily workload data.  By email dated October 17, 2023, she informed the Army that she felt she was receiving "the run around" with respect to her requests for that data.  (SUMF ¶ 22)  She further stated that because "[c]ommunications . . . [had] become increasingly difficult" she was not comfortable having the kick-off meeting scheduled for that week (*id.*).  The Army responded by canceling the kick-off meeting and notified MRS of the cancellation via email dated October 19, 2023 (SUMF ¶ 26; R4, tab 21 at 3).

6.  The record does not reflect that the parties had any further substantive communications until December 12, 2023, the date the Army notified MRS it was "fully terminating [the contract] for its convenience" (R4, tab 26 at 1; SUMF ¶ 30).  On December 14, 2023, the Army issued a modification that it described as a "complete no-cost termination" for convenience that included the following release of claims:

> The Contractor unconditionally waives any charges against the Government arising under the terminated portion of the contract by reason of its termination, including without limitation, all obligations of the Government to make further payments or to carry out any further undertakings under the terminated portion of the contract.  Nothing in this paragraph affects any other covenants, terms or conditions of the contract.

(R4, tab 59 at 1)

7.  MRS did not execute that modification.  Instead, by email dated December 15, 2023, MRS informed the Army that it incurred costs associated with the contract and "demand[ed] reimbursement of said recovery costs associated with contract award.  What do you need to settle incurred costs of which the Government will pay ASAP?" (R4, tab 65 at 3; *see* SUMF ¶ 33 (noting appellant's inquiry))

8.  The record does not contain any subsequent communications between the parties until April 3, 2024, when they began exchanging emails concerning the requirements for MRS's termination settlement proposal (TSP) (R4, tab 60, tab 64 at 2-9).

9.  MRS's TSP, dated April 22, 2024, consisted of an invoice and payroll documentation, a narrative prepared by MRS's president, and a 17-page submission consisting of emails and their attachments (R4, tab 60 at 1, tabs 61-63, tab 64 at 1-2, tab 65 at 1-2).  The invoice broke out the costs by employee and provided a brief summary of the work they performed, their hourly rate, and the number of hours they worked.  It also included the cost of preparing the TSP.  It sought payment in the amount of $44,559.80.  (R4, tab 61)

10.  The narrative stated the following concerning the claimed costs:

> The settlement proposal includes contract work spanned hourly rates and hours worked until we were notified of contract termination dated December 12, 2023 . . . .
>
> . . . .
>
> After receipt of the termination, MRS was required to close out work which consisted of Contractual obligations, HR activities the applications that we received and deal with the inquiries that had arrived from other companies and individuals that had responded during the period MRS was intensely recruiting for this contract.

(R4, tab 65 at 1-2) (syntax in original)

11.  The contracting officer responded to MRS's TSP via email dated May 3, 2024.  She expressed concern that the "amount of effort/claimed labor hours put toward the contract in approximately three months' time is almost equivalent to the amount quoted to perform the contract for the base year" (SUMF ¶ 37 (quoting R4, tab 32 at 4-5)).  She said she required additional information to evaluate the TSP, including the number of people interviewed and the number of other contracts MRS had that the employees referenced in the invoice may have worked on (*id.*).

12.  By email dated May 6, 2024, the contracting officer inquired of MRS whether potential candidates had been submitted to the Army for approval and whether fill-rate reports had been provided.  She indicated MRS should provide supporting documentation to confirm its responses.  She also requested documentation of MRS's allegation that the contract specialist and contracting officer's representative were making demands during the first weeks of the contract.  MRS's president responded to the contracting officer by email dated May 8, 2024, and indicated supporting materials were attached.  (R4, tab 66 at 11-13)

4

13.  By email dated May 23, 2024, the contracting officer again requested more information to support MRS's TSP.  She explained MRS should submit "whatever you need to establish costs incurred due to the Government Termination for Convenience." (R4, tab 66 at 8)  She also asked for a timeline of "the actions taken that correlate with the hours and employees submitted as part of your claim.  The timeline should show the efforts and actions taken in direct support of the terminated contract."  (*Id.*)  She reiterated the need for MRS to provide documentation supporting the costs being claimed (*id.*).

14.  On June 4, 2024, MRS submitted a revised invoice that increased the total dollar amount sought to $47,223.80.  Also attached was an invoice from a law firm for legal fees in the amount of $3,090.  (R4, tab 66 at 1, tab 67; SUMF ¶¶ 41-43)  MRS submitted a second revised invoice by email dated August 12, 2024.  This invoice incorporated the legal fees but reduced the overall amount sought to $38,875.80.  (R4, tab 44 at 1; SUMF ¶ 44)

15.  On September 27, 2024, the contracting officer issued her final decision (COFD), which indicated it was in response to "Claim Number CLM-24-007" (R4, tab 47 at 1).  The contracting officer stated that because of the difficulties "being presented in initiating performance," the Army determined it would be in the government's best interest to terminate the contract for convenience (*id.* at 1-2).  The contracting officer further stated that MRS never initiated performance by submitting any reports or information required by the PWS and performed no medical coding services.  She found that while MRS had not demonstrated entitlement to the full TSP amount of $38,875.80, "for purposes of settling the termination for convenience, the [Army] will provide MRS $9,418.00 for preparatory costs incurred and reasonable settlement expenses."  (SUMF ¶ 46; R4, tab 47 at 4-5)

16.  MRS's president responded to the COFD by email dated September 30, 2024, listing several reasons she thought MRS was entitled to the full TSP amount.  However, she also stated that she would "like to discuss fastest and quickest payment resolution: what are your thoughts about banking?"  (R4, tab 48 at 1)  During the following two weeks, she emailed the contracting officer multiple times seeking information about the payment (R4, tab 49 at 2-7, tab 51 at 2-4, tab 54 at 4-8).

17.  By email dated October 16, 2024, the contracting officer notified MRS she was forwarding a document to allow for payment of the "claim submitted in response to [the] termination for convenience of contract W91YTZ-23-C-0018" (R4, tab 49 at 1).  She requested that MRS sign and return the document as quickly as possible (*id.*).

18.  The purchase order and bilateral modification the contracting officer forwarded was identified as "Contract No. W91YTZ25P0002" (hereinafter Mod 2) (R4, tab 50

at 1).  It included one contract line item (CLIN 0001) in the amount of $9,418, accompanied with a release stating the following:

> CLAIM 24-0007 – Remote Coding Services.  Reference contract W91YTZ-23-C-0018 PoP [period of performance] 10/1/2023 - 12/12/2023.  RELEASE OF CLAIM:  The contractor unconditionally waives any charges against the Government arising under the terminated portion of the contract or by reason of its termination, including without limitation, all obligations of the Government to make further payments or to carry out any further undertakings under the terminated portion of the contract.  The Government acknowledges that the Contractor has no obligation to perform work or services or to make further deliveries under the terminated portions of the contract.  Nothing in this paragraph affects any other covenants, terms or conditions of the contract.[3]

(SUMF ¶ 48 (quoting R4, tab 50 at 3))  The release did not contain any exceptions or reservations, and none appeared elsewhere in the contract document (R4, tab 50).[4]

19.  MRS's president returned a signed copy of the first page of the contract document on October 16, 2024, and the contracting officer signed it on the same date (SUMF ¶¶ 49-50; R4, tab 51 at 1, tabs 52-53).  In the email from MRS accompanying her signed copy, MRS's president informed the contracting officer she would submit an invoice for the payment via the Wide Area Work Flow (WAWF) system (SUMF ¶ 49; R4, tab 51 at 1).  This email contained no reservation of rights or exceptions to the release.

20.  Although they appear in the Rule 4 file in a piecemeal fashion, it is undisputed that the full contract modification containing the release, the first pages of the contract document containing the parties' signatures, and the accompanying emails in which the parties expressed their intent, together constitute fully executed bilateral Mod 2 (R4, tabs 49-53).

---

[3] The release contained a few minor typographical errors (spaces omitted between words), which we have corrected.  It also added an extra zero to the "claim number" identified in the COFD, an error we consider immaterial (R4, tab 47 at 1).

[4] The remainder of the record is similarly devoid of any exceptions or reservations.

6

21. The record indicates that MRS submitted its invoice for payment on October 17, 2024 (SUMF ¶ 51; R4, tab 55 at 1). The invoice, in the amount of $9,418, included virtually identical release language as the release appearing in Mod 2:

> Claim Remote Coding CLAIM 24-0007 Remote Coding Services. Reference contract W91YTZ-23-C-0018 PoP [period of performance] 10/1/2023 - 12/12/2023. RELEASE OF CLAIM: The contractor unconditionally waives any charges against the Government arising under the terminated portion of the contract or by reason of its termination, including without limitation, all obligations of the Government to make further payments or to carry out any further undertakings under the terminated portion of the contract. The Government acknowledges that the Contractor has no obligation to perform work or services or to make further deliveries under the terminated portions of the contract. Nothing in this paragraph affects any other covenants, terms or conditions of the contract. [5]

(SUMF ¶ 52; R4, tab 55 at 1)

22. The Defense Finance Accounting Service (DFAS) paid MRS $9,418 on October 27, 2024 (SUMF ¶ 53; R4, tab 55 at 5-6, tab 56).

23. MRS filed a notice of appeal with the Board by email dated December 13, 2024, stating only that it "wish[ed] to appeal the [contracting officer's] final decision with election rule 12.2 the Small Claims (Expedited) procedure."[6] By email dated January 24, 2025, MRS filed what it described as a "narrative," which the Board designated as its complaint. The narrative called the Army's decision to terminate "unjustified" and alleged it "lacked merit given MRS's documented compliance with FAR 52.212-4 and FAR 49.201" (compl. ¶¶ 2, 8-9). However, its primary focus was upon the Army's conduct of the TSP process, which it criticized harshly (*id.* at 3-9). Its request for relief sought "[r]econsideration of Settlement Amount . . . [and]

---

[5] Like the release in Mod 2, this release contained minor typographical errors, which we have corrected and added an extra zero to the COFD's "claim number," an immaterial error (R4, tab 47 at 1).

[6] MRS requested two extensions to file its complaint due to the severe impact of wildfires in California. By Order dated January 14, 2025, the Board recognized the hardship MRS was encountering and, given the uncertainty caused by the wildfires, removed the appeal from the Rule 12 docket.

7

reimbursement of the full $38,875.00 in allowable costs" (*id.* at 9). [7] The narrative did not mention the release and did not request that the termination be found improper.

DECISION

*The Parties' Positions*

The Army's motion seeks summary judgment as a matter of law because the relief MRS requests is barred by the release contained in Mod 2 and the invoice MRS submitted via the WAWF system. The Army points out that the release was unconditional and contained no reservation of claims to be pursued at a later date and notes that MRS accepted payment of the agreed-upon amount, $9,418. (Gov't mot. at 21-22) The Army also argues that Mod 2 constitutes an accord and satisfaction, an additional bar to MRS's recovery (*id.* at 23-26).

The Army also asserts that the Board does not possess jurisdiction to hear the appeal challenging the termination for convenience because it was not filed within 90 days of receipt of the notice of termination (issued on December 12, 2023), as is required by the Contract Disputes Act (CDA), 41 U.S.C. § 7104(a) (*see* gov't mot. at 29-30). Because neither the notice of appeal nor the complaint asked that we find the termination improper, and the filings mainly took issue with the government's conduct and the amount of relief awarded (SOF ¶ 23), we determine that we do possess jurisdiction to hear the appeal and deny this portion of the Army's motion.[8]

In its opposition, MRS is largely non-responsive to the issues raised in the Army's motion. It does not refer to Mod 2 or the release itself, nor does it respond to the Army's arguments that the release bars it from recovery and further constitutes an accord and satisfaction. Instead, it criticizes the Army's administration of the contract during the three months between award and termination, as well as the Army's conduct of the termination settlement process, and alleges violations of the contract and the FAR. (App. opp'n at 1-6) MRS further charges that Army personnel were biased and accuses government counsel of improper and unethical conduct (*id.* at 7-8, 10; app. ltr. dtd. April 26, 2025, at 2-3 (sur-reply)). The Army responded to those charges in its reply, alleging MRS improperly used artificial intelligence (AI) in its

---

[7] The request for relief also sought reinstatement of the appeal on the Rule 12 docket (compl. ¶ 9). The Board denied that request by Order dated February 5, 2025.

[8] In view of our disposition of this appeal, we find it unnecessary to address the Army's additional argument that appellant's complaint fails to state a claim upon which relief may be granted (gov't mot. at 26-29).

submissions to make false assertions concerning the FAR and Army personnel (gov't reply at 2).

*Analysis*

The standard for determining whether summary judgment is appropriate is based upon long-established precedent followed by the Federal Circuit and this Board:

Summary judgment is proper when there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). A fact is material if it may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The movant bears the burden of establishing the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 322. Regardless of the type of claim being raised, the applicable substantive law determines which facts are material and thus preclude an entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248. Such facts must be viewed in the light most favorable to the non-moving party. *Id.* at 255; *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993). However, the non-movant must set forth specific facts demonstrating the existence of a genuine issue of material fact; mere conclusory statements and bare assertions are inadequate. *Mingus*, 812 F.2d at 1390-91; *Liberty Lobby*, 477 U.S. at 252. Our responsibility is not "'to weigh the evidence and determine the truth of the matter,' but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting *Liberty Lobby*, 477 U.S. at 249); *Afghan Premier Logistics*, ASBCA No. 62938 *et al.*, 22-1 BCA ¶ 38,074 at 184,904. Here, we evaluate materiality by examining the law applicable to releases and the doctrine of accord and satisfaction. *Liberty Lobby*, 477 U.S. at 248.

*Release and Accord and Satisfaction*

Release is a separate affirmative defense from accord and satisfaction. *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010). A release is a contract under which a signing party "abandons a claim or relinquishes a right that could have asserted" against the other signing party, while in an accord and satisfaction, "a claim is discharged because some performance other than that which was claimed to be due is accepted as full satisfaction of the claim." *Id.* (citations omitted). A bilateral contract modification may be both a release and an accord and satisfaction. *KUNJ Constr.*, ASBCA No. 63240, 24-1 BCA ¶ 38,504 at 187,146. Under either defense, the Army as the moving party "must show that both parties intended [the modification] to release and/or discharge the claim that is the subject of this appeal." *Optex Sys. Inc.*, ASBCA No. 58220, 14-1 BCA ¶ 35,801 at 175,097.

9

We interpret the terms of a release, like any other contract, by examining its plain language. *Merrick Constr., LLC*, ASBCA No. 60906, 18-1 BCA ¶ 37,012 at 180,250 (citing *Clean by Lucy, Inc.*, ASBCA No. 58432 *et al.*, 16-1 BCA ¶ 36,287 at 176,969). The intent of the parties at the time of execution should be "'sought from the whole and every part'" of the release. *KUNJ Constr.*, 24-1 BCA ¶ 38,504 at 187,146 (quoting *Optex*, 14-1 BCA ¶ 35,801 at 175,097). "'Even where a release is complete on its face and unqualified . . . we [still] review the circumstances surrounding its execution in order to effect the true intention of the parties.'" *Id.* (quoting *Sedona Contracting, Inc.*, ASBCA No. 52093, 99-2 BCA ¶ 30,466 at 150,513).

The affirmative defense of accord and satisfaction requires a different analysis. To meet its burden of proving that an accord and satisfaction is present, the Army must show (1) the subject matter was proper; (2) both parties were competent; (3) a meeting of the minds between the parties existed; and (4) there was consideration. *Holland*, 621 F.3d at 1382. There must be "'mutual agreement between the parties with the intention clearly stated and known to the contractor.'" *KUNJ Constr.*, 24-1 BCA ¶ 38,504 at 187,146 (quoting *Coastal Gov't Servs., Inc.*, ASBCA No. 50283, 99-1 BCA ¶ 30,348 at 150,088). Where a bilateral contract modification is involved, as is the case here, the best evidence of the parties' intentions will be the modification's terms. *Ruby Emerald Constr. Co.*, ASBCA No. 61096, 18-1 BCA ¶ 37,197 at 181,086 (citing *Whiting-Turner Contracting Co.*, ASBCA No. 56319, 10-1 BCA ¶ 34,436 at 169,951).

*There Are No Material Facts in Dispute concerning the Purpose and Intent of the Release In Mod 2*

The language of the release contained in Mod 2 is clear and unambiguous, referencing the contract number, the "claim number" assigned to MRS's TSP, and the period of performance it covers – October 1, 2023, through December 12, 2023. It provides that the contractor "unconditionally waives any charges against the Government arising under the terminated portion of the contract or by reason of its termination, including without limitation, all obligations of the Government to make further payments or to carry out any further undertakings under the terminated portion of the contract." (SOF ¶ 18) The release itself includes no exceptions or reservations, and none appear anywhere else in Mod 2 or the remainder of the record (*id.*).

A plain reading of the release shows that the parties intended for the government to compensate MRS in the amount of $9,418 and no more – that upon execution of Mod 2, the Army had no further obligation to pay MRS. The record contains no evidence, and MRS has produced none, showing a contrary intention. Indeed, MRS's opposition and sur-reply did not even acknowledge the existence of

either Mod 2 or the release it contains. MRS, as the non-moving party, bears the burden of identifying material facts in dispute concerning the release that demonstrates a genuine issue for trial. *Afghan Premier Logistics*, 22-1 BCA ¶ 38,074 at 184,904 (citing *Holmes & Narver*, 02-1 BCA ¶ 31,849 at 157,393). Because it has not met that burden, it is barred from recovering any further payments from the Army under the contract.

*There Are No Material Facts in Dispute Concerning the Existence of an Accord And Satisfaction*

The record evidence also establishes that all four elements of the affirmative defense of accord and satisfaction have been met. The subject matter of the contract and modification are both medical coding services (SOF ¶¶ 1, 18, 20), satisfying the first element. *Ruby Emerald*, 18-1 BCA ¶ 37,197 at 181,086. The second element, competent parties, is met when the parties signing the modification are authorized to do so. *The Haskell Co.*, ASBCA No. 63291, 24-1 BCA ¶ 38,537 at 187,332 (citing *Costar III, LLC*, ASBCA No. 56479, 11-2 BCA ¶ 34,830 at 171,370). That is the case here (SOF ¶¶ 19-20).

With respect to the third element, a meeting of the minds exists where there are "'accompanying expressions sufficient to make the [claimant] understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise.'" *Holland*, 621 F.3d at 1382 (quoting *Chesapeake & Potomac Tel. Co. of Va. v. United States*, 228 Ct. Cl. 101, 109 (1981)). Here, after the contracting officer issued her COFD, MRS's president was persistent in seeking the payment the contracting officer stated the Army would make (SOF ¶ 16). She signed Mod 2, which explicitly provided that 1) its purpose was to allow for payment of the claim MRS submitted in response to the termination for convenience; 2) it was for the amount of $9,418; and 3) MRS agreed to "unconditionally waive[]" any claims against the Army for further payments (SOF ¶¶ 18-20). MRS's president also did not reserve any right to assert any future claims in the language of the release itself or anywhere else in the record (SOF ¶ 18). The intention of Mod 2 was clearly stated, and having signed it, MRS was well aware of that intention. Thus, a meeting of the minds between the parties existed. *Ruby Emerald*, 18-1 BCA ¶ 37,197 at 181,086.

The last of the four elements, consideration, is defined as "'a bargained for exchange consisting of an act, forbearance, or return promise.'" *Supply & Serv. Team Gmbh*, ASBCA No. 59630, 17-1 BCA ¶ 36,678 at 178,602 (quoting *Carter v. United States*, 102 Fed. Cl. 61, 66 (2011)). As we noted above, pursuant to Mod 2, the Army agreed to pay MRS $9,418, and MRS agreed to unconditionally waive any claims for further payments from the Army. Moreover, MRS submitted an invoice and accepted payment of that amount. (SOF ¶¶ 21-22) This bargained-for exchange of promises constitutes consideration.

The Army has met its burden of proving the existence of a valid and binding release and that all four elements of accord and satisfaction exist. MRS has not come forward with any material evidence demonstrating otherwise. MRS has failed to meet its burden of proof, which entitles the Army to summary judgment as a matter of law. *Ruby Emerald*, 18-1 BCA ¶ 37,197 at 181,086.

*Other Issues Raised by the Parties Not Impacting Our Decision*

The parties raise several extraneous issues that do not affect our analysis of the Army's summary judgment motion but that nevertheless warrant our attention. MRS alleges that both before and after it filed its notice of appeal, Army personnel, including counsel, were biased, acted unethically, and made allegedly defamatory statements (app. opp'n at 7-8, 10; app. sur-reply at 2-3). We have seen no evidence in the record to support those allegations.

In turn, the Army alleges that some of the materials MRS submitted in this appeal were generated using AI to create "baseless and unsupported attacks" on Army personnel and to make false statements concerning FAR clauses (gov't reply and mot. strike at 42). The Army points us to *Sanders v. United States*, 176 Fed. Cl. 163 (2025), in which the Court of Federal Claims considered, but ultimately rejected, sanctioning a pro se plaintiff who submitted filings that included "hallucinations" of caselaw that did not exist in support of propositions directly contrary to applicable precedent. *Sanders*, 176 Fed. Cl. at 168-70. We have reviewed the materials MRS submitted in response to the Army's motion and find nothing even remotely approaching the conduct described in *Sanders*.[9]

Finally, we remind the parties that while they are entitled to vigorously prosecute their positions before the Board, we still expect them to conduct themselves in a decorous and respectful manner. We will not consider ad hominem attacks and have not considered them here. *See Inter-Cont'l Equip., Inc.*, ASBCA No. 36807, 94-2 BCA ¶ 26,708 at 132,860 (admonishing a party, stating that "personal attacks

---

[9] With respect to the separate requests from both parties that the appeal be placed "under seal" or protective order to safeguard their respective reputations (*see* gov't reply and mot. strike at 42-43; app. sur-reply at 3), we refer them to the Board's procedure for requesting protective orders, available on the Board's website, www.asbca.mil, under the tab Rules and Guidance. If the parties submit a joint request that complies with that guidance, the Board will take it under consideration. However, here, there was no reason to issue a protective order, so the request was denied by the Board via teleconference on May 6, 2025.

have no place before this Board or in any forum where civility is valued and expected.").

CONCLUSION

We grant the Army's motion for summary judgment and deny the appeal. We deny the Army's motion to strike as moot.

Dated: July 15, 2025

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

ROBYN L. HAMADY
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 64036, Appeal of Medical Receivables Solutions, Inc., rendered in conformance with the Board's Charter.

Dated: July 15, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals